NOT DESIGNATED FOR PUBLICATION

Nos. 126,755
126,756

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.S. and E.S.,
Minor Children.

Appeal from Butler District Court; JOE E. LEE, magistrate judge. Submitted without oral argument. Opinion filed January 31, 2025. Affirmed.

*Shannon L. Cooper*, of Andover, for appellant natural mother.

*Cheryl M. Pierce*, assistant county attorney, for appellee.

*Stephany L. Hughes*, guardian ad litem, of Stephany L. Hughes, LLC, of El Dorado.

Before PICKERING, P.J., ISHERWOOD and HURST, JJ.

PICKERING, J.:  This case requires us to answer whether Mother had met the verification requirements under K.S.A. 38-2273(e). In this case, Mother appeals the district court's termination of her right to parent her two minor children, K.S. and E.S., claiming there was insufficient evidence to support the district court's decision that she was unfit. The guardian ad litem (GAL) contends that Mother's notice of appeal was insufficient, depriving us of jurisdiction, and that Mother failed to designate a record on appeal sufficient for us to conduct review. Upon review, we find we have jurisdiction. We also find the State produced sufficient evidence that Mother was unfit; therefore, we affirm the termination of her parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

On November 23, 2020, a school counselor contacted law enforcement after K.S. (born in 2009) disclosed that her father had been touching her genitals. The counselor then contacted K.S.'s parents. The parents told law enforcement that K.S. was lying, explaining that K.S. is bipolar. At a forensic interview with the Sunlight Child Advocacy Center, K.S. stated she did "not feel safe to go home." K.S. and her sibling, E.S. (born in 2010), were taken into custody.

The State filed petitions on November 25, 2020, alleging that K.S. and E.S. were children in need of care (CINC). The State alleged K.S. was without adequate parental care, control, or subsistence; was without the care or control necessary for her physical, mental, or emotional health; had been physically, mentally, or emotionally abused or neglected or sexually abused; and was willfully and voluntarily absent from her home without the consent of the parents. The State alleged E.S. had been residing in the same residence with a sibling who had been physically, mentally, or emotionally abused or neglected, or sexually abused.

The children were placed in the Kansas Department for Children and Families (DCF) custody with out-of-home placement at a temporary custody hearing on November 30, 2020. Both children were adjudicated as CINC on February 9, 2021. Custody of the children at that time was to remain with DCF in out-of-home placement.

The district court held multiple review hearings between November 30, 2020, and June 29, 2021, each time ordering that the children remain in DCF custody in out-of-home placement. The district court held a permanency hearing on October 14, 2021, and determined that reintegration was a viable permanency goal. Mother was ordered to continue with family therapy. At a review hearing on February 17, 2022, Mother's

visitation was ordered to be supervised. She was ordered to complete family therapy with K.S. and to complete a parent-child evaluation.

On May 24, 2022, the district court held another permanency hearing and determined that reintegration was no longer viable. The decision was based on Mother's slow progress on completing case plan tasks and her unwillingness to attend therapy in person.

On February 10, 2023, the State filed a motion to terminate Mother's parental rights for unfitness based on several statutory provisions. A hearing on the termination of Mother's parental rights was held on April 27, 2023. Mother appeared in person and was represented by counsel. Father did not appear; his rights were terminated, and he did not appeal. A summary of the evidence presented at Mother's termination hearing follows.

Callie Wright, a therapist for Mother, testified that she performed an intake assessment on May 4, 2022, after TFI, the agency providing foster care services, referred Mother for mandated individual counseling. Wright met with Mother five times via tele-health for follow-up therapy between May 9, 2022, and June 2, 2022. Mother was diagnosed with adjustment disorder with mixed anxiety and depressed mood. Wright recommended further psychological evaluations based on Mother's self-reported traumatic brain injury, "documented history of poor therapy engagement and attendance[, and] concerns reported by another clinician during a parenting evaluation." Wright testified that the psychological evaluation was completed after Mother was discharged from her services. Wright had given Mother a 30-day notice to provide the evaluation by November 18, 2022. When Mother failed to do so, Wright discharged her on November 21, 2022. Then Wright received the report on December 20, 2022. The report "indicated that there could be cognitive impairments that required further testing" and to "continue therapy."

3

Rae Marcy, a case worker with TFI, testified that she worked on this case between March 3, 2022, and October 21, 2022. Mother's visits with the children at that time were supervised for one hour in the community. Visits were not held at Mother's house due to safety issues of mice and roach infestation. Marcy confirmed that Mother filed for divorce from Father in September 2022. Mother reported to Marcy that she moved out of the home where Father lived in the summer of 2022. Due to the allegations that Father had sexually abused K.S., the agency staff was concerned that it took Mother almost two years to leave him. Marcy had concerns about Mother's ability to protect the children moving forward and that Mother did not seem to fully comprehend the severity of the situation. Marcy testified that Mother had multiple jobs during the case, never maintaining a job longer than two months and some for just a few weeks. At that time, she was not recommending termination of Mother's rights. She stated that with reminders, coaching, and prompting, Mother managed to make progress on her case plan tasks.

However, at the time of the termination hearing seven months later, Marcy recommended termination. Marcy stated that Mother "didn't know how to complete these tasks by herself." For instance, Marcy worked from June to November 2022 to prompt Mother to complete the psychological evaluation, which was finally completed in December 2022. Despite being requested to do so "at least twice a week," Mother never signed a release for TFI to talk with the professional who performed the psychological evaluation on Mother.

The individual therapist for both children, Samantha Runnion, also testified. Runnion provided therapy services to K.S. since September 2021 and E.S. since April 2022. Runnion testified that the children were having weekly supervised visits with Mother for one hour. She stated:

> "'[E.S.] is struggling to understand why his mother is not willing to follow the rules for visits so that they can have longer visits and move towards reintegration. [E.S.] has become increasingly frustrated by his [mother's] blatant disregard for the visitation rules and her cutting the visits short to the point that he told his TFI worker a couple of weeks ago that he did not want to attend his visit with his mother.'"

Runnion also stated that E.S. had anxiety about the uncertainty in his future due to lack of permanency. Until that happened, she said E.S. would be really anxious.

Runnion testified that an ongoing theme during her time with K.S. was that Mother did not believe K.S.'s allegations of Father's abuse. K.S. also told Runnion that Mother "'had been emotionally and physically abusive to her for many years.'" K.S. told Runnion that Mother called her "'fat, ugly, and a disgrace.'" K.S. relayed incidents where her mother pulled her hair, shoved her, and slapped her in the face. On January 5, 2022, K.S. told Runnion "'that she had mixed feelings'" regarding reintegrating with Mother and "'knows her mother will not keep her safe.'" K.S. told Runnion that she disclosed her father's abuse to Mother when she was nine years old, and Mother said, "'[T]hat's just your dad'" and did nothing.

Runnion testified about calling Mother on the telephone to gauge her readiness for family therapy. Runnion asked Mother if she believed K.S.'s allegation of sexual abuse, and Mother responded, "'I have to be careful how I answer that question.'" Runnion noted that throughout the call, Mother did say she believed K.S., but she also contradicted herself as the call went on. Ultimately, Runnion did not believe family therapy between K.S. and Mother was appropriate at that time based on Mother's responses.

Runnion also testified that she had concerns about Mother's choices, specifically, having a boyfriend present during a supervised visit with K.S., despite being informed that it was not allowed. K.S. reported to Runnion that Mother shared the fact that K.S. made sexual abuse allegations against Father with the boyfriend. On the second visit that

the boyfriend was present, K.S. reported that the boyfriend told her he wanted to take her one-on-one to get her nails done some time, and Mother approved. Runnion was concerned about Mother's poor choice of sharing that sensitive information and Mother's apparent comfort with allowing an adult man to take her daughter out alone after only two short meetings. Another time, Mother took a different boyfriend with her to K.S.'s basketball game, despite knowing it was against the rules, and did nothing when the man hugged K.S. after the game. Runnion testified that the interactions with these boyfriends caused K.S. anxiety, fear, and confusion, stating, "She was really confused as to why her mother would continue to violate the rules; bring men around that were strange to [K.S.]; and be okay with these men approaching her in the way that they did." It was Runnion's opinion that Mother was not capable of keeping the children safe.

Shortly after Runnion left the witness stand, counsel for Mother informed the district court that Mother said she had to leave. The district court replied: "This is a civil matter. If she wishes to leave, she can." The district court then took a recess of 11-12 minutes, to reconvene at 3 p.m. When the court reconvened, counsel for Mother told the court that she was not sure what the situation was with Mother. Counsel said:

> "She had indicated to me that she had to leave. And then I advised her during the break she could ma—she was worried about a ride. I told her she could make some phone calls during the break to make arrangements.
> "And then I checked with the security desk, and they weren't sure if she had left, 'cause there was a lot of people coming in and out. But then she maybe headed towards the courthouse on foot."

The court confirmed that Mother was voluntarily absent from the proceedings and then asked the State to call its next witness.

Janett Jacobs, the court appointed special advocate, testified for the State regarding Mother's housing and employment. Jacobs stated that in September 2022

6

Mother was living at the Emery Gardens Apartments in Wichita, which at that time were the subject of a number of news reports on concerning conditions. The news reported "black mold, trash, the walls and the floors in bad shape, bugs, those kinds of things." As of a week before the termination hearing, Mother told Jacobs she was still living there. Jacobs testified that Mother had nine jobs between January 2021 and April 2023.

Jacobs also testified that Mother brought boyfriends to her visitation with her children, even though she was ordered not to involve anyone else in the visits. Jacobs said that Mother told her that she was seeing a therapist and that the therapist said there was nothing for Mother to work on, but this could not be verified because Mother had never signed a release form for Jacobs to speak to the therapist. Jacobs also testified, "[K.S.] has stressed to me on three different occasions, very directly, that she does not feel comfortable going home. She does not want to go home, because she does not trust her mother. That she thinks her mother would allow the same thing to happen again."

After Jacobs finished testifying, the district court stated on the record that Mother had returned to the courtroom at 3:11 p.m.

Kerby Kelly, a case manager with TFI, was involved in the case from October 2022 to March 2023. Kelly testified that supervised visits were required originally to make sure Mother was not talking to the children about the case or other things that should be addressed through therapy. When Mother began including boyfriends in the visits, that became a safety issue of great concern. Mother also had a history of ending visits early. Mother cut visits short six times in the five months from October 2022 to February 2023.

One of Mother's case plan tasks was to have anyone who interacts with the children undergo a background check, yet Mother continued to have other people at the visits without background checks. The scheduled visit for Thanksgiving 2022 was to last

four hours at Mother's home. But Mother had a boyfriend at the home, so the children had to pack up their things and go to the mall with Mother. The visit was scheduled from 1 p.m. to 5 p.m., but Mother ended it at 3:30 p.m., saying she needed to go to work.

Kelly testified that one of Mother's case plan tasks from the beginning was to obtain therapy. Yet Mother told her most recent therapist that "'she was only there because she was told that she has to be there,'" indicating that she was not open or receptive to therapy. And Mother was discharged from her previous therapist for noncompliance and missing appointments. Kelly testified that since Mother had been seeing her most recent therapist, Mother had participated in six appointments but had rescheduled four and had failed to show up to four.

After Kelly's testimony, the State rested its case. Counsel for Mother stated that she would potentially call Mother as a witness, but she "isn't here." The district court allowed a few minutes for counsel to step out and look for Mother. When the court reconvened, counsel for Mother stated: "I would only call [Mother], as a witness. She's not here. She asked me to ask if we could postpone the proceedings to another day." The court inquired why Mother was no longer present. Counsel stated: "I couldn't quite understand what her dilemma is. But it has something to do with her car and being unable to get anyone to take her—except for right now—to deal with it." The district court denied a continuance. The district court then heard closing arguments.

The State and the GAL argued for termination. Mother's counsel argued against termination. After hearing the evidence and evaluating the testimony, the district court made a finding on the record that the State proved by clear and convincing evidence that Mother was unfit and that her unfitness was unlikely to change in the foreseeable future. The court also found that it was in the children's best interests that Mother's rights be terminated. The district court terminated Mother's parental rights. Mother timely appealed.

ANALYSIS

## I.   WE HAVE JURISDICTION OVER THIS APPEAL

*Standard of Review*

As an appellate court, we have only jurisdiction as provided by law. Whether jurisdiction exists is a question of law, subject to unlimited appellate review. To the extent statutory interpretation is needed to resolve this issue, this panel's review is unlimited. *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014).

*Discussion*

The GAL asserts that Mother's verifications on her notice of appeal and brief were insufficient and therefore in violation of K.S.A. 38-2273(e). We are therefore tasked with determining whether we have jurisdiction over this appeal. Under K.S.A. 38-2273(e): "Every notice of appeal, docketing statement and brief shall be verified by the appellant if the appellant has been personally served at any time during the proceedings. Failure to have the required verification shall result in the dismissal of the appeal." The record reflects that Mother had been personally served throughout the proceedings, so her notice of appeal needed to be verified.

The verification on Mother's notice of appeal reads:  "COMES NOW [Mother] of lawful age, being first duly sworn and under oath, and states:  I am [Mother], and I have read and understand the above and foregoing Notice of Appeal, and believe that all of the content thereof is true and correct." The GAL claims that this verification is insufficient because the word "believe" is a qualification. She asserts that each verification must be unqualified and absolute under Kansas law.

9

The GAL also asserts that Mother's original appellant brief was insufficient. Mother's original brief, however, was later stricken. In light of this, the GAL's challenge to Mother's original brief is now moot. Of note, the verification on Mother's amended brief reads: "I, [Mother], being first duly sworn upon oath, states as follows: That I am the Appellant in the above action; I have read the foregoing brief and I swear or affirm that the allegations and statements contained therein are true and correct." The GAL did not challenge the verification on Mother's amended brief. Accordingly, we focus only on the notice of appeal verification.

"'It is a fundamental proposition of Kansas appellate procedure that an appellate court only obtains jurisdiction over the rulings identified in the notice of appeal.'" *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 293 Kan. 633, 637, 270 P.3d 1074 (2011); *In re Adoption of E.D.*, 57 Kan. App. 2d 500, 505, 453 P.3d 1202 (2019). K.S.A. 2023 Supp. 60-2103(b) requires: "The notice of appeal shall specify the parties taking the appeal; shall designate the judgment or part thereof appealed from; and shall name the appellate court to which the appeal is taken." See *Hernandez v. Pistotnik*, 60 Kan. App. 2d 393, 411, 494 P.3d 203 (2021). But appellate courts are also required to construe statutes liberally and should avoid dismissing an appellant's case for lack of jurisdiction based on technical violations of these filing requirements unless the appellee was prejudiced. See *Associated Wholesale Grocers*, 293 Kan. at 638-39; *Hernandez*, 60 Kan. App. 2d at 411-12.

The GAL asks us to dismiss Mother's case for a technical violation in Mother's verification of the notice of appeal. The GAL cites three cases in support of her proposition that verifications must be absolute and unqualified, and declarants must have affirmative knowledge of the statement's truthfulness. See *Double S, Inc. v. Northwest Kansas Prod. Cred. Ass'n*, 17 Kan. App. 2d 740, 843 P.2d 741 (1992); *Kansas Lumber Co. v. Wang*, 12 Kan. App. 2d 20, 733 P.2d 1266 (1987); *Lewis v. Wanamaker Baptist Church*, 10 Kan. App. 2d 99, 692 P.2d 397 (1984). These cases, however, relate to

10

mechanic's liens and do not involve a parent's fundamental right to parent his or her child. *Double S* involves an artisan's lien on personal property. *Lewis* and *Kansas Lumber Co.* involve the verification of lien statements required to file liens on real property.

K.S.A. 60-1102(a) provides:

"(a) *Filing.* Any person claiming a lien on real property, under the provisions of K.S.A. 60-1101, and amendments thereto, shall file with the clerk of the district court of the county in which property is located, within four months after the date material, equipment or supplies, used or consumed was last furnished or last labor performed under the contract a verified statement showing:
      (1) The name of the owner,
      (2) the name and address sufficient for service of process of the claimant,
      (3) a description of the real property,
      (4) a reasonably itemized statement and the amount of the claim, but if the amount of the claim is evidenced by a written instrument, or if a promissory note has been given for the same, a copy thereof may be attached to the claim in lieu of the itemized statement."

The *Lewis* panel discussed the purpose for the strictness in the sufficiency of verifications in mechanic's lien proceedings, stating:

"The mechanic's lien, once it attaches, clouds the interest of the landowner and takes priority over all subsequent encumbrances. The requirement that the person verifying the lien statement swear absolutely to the truth of the facts stated conveys to the signer both the significance of the ramifications of the lien and the duty to avoid perjury. A qualified verification statement would permit the verifier to affirm facts as accurate upon hearsay or mere belief without actual knowledge of the truth. Such limited knowledge should not be permitted to justify the encumbrance of another's realty. [Citations omitted.]" 10 Kan. App. 2d at 100-01.

K.S.A. 38-2273(e), unlike the mechanic's lien statute, does not require a verified statement containing specific information. It requires three specific documents to be

11

"verified " for an appeal in a CINC matter—the notice of appeal, docketing statement, and appellant's brief. K.S.A. 38-2273(e). Unlike the signer in a mechanic's lien, the signer in a CINC appeal is not clouding title to another's real property or otherwise affecting someone else's rights. Here, Mother is challenging the district court's termination of her parental rights. Her notice of appeal begins that process. See K.S.A. 38-2273(a) ("An appeal may be taken by any party or interested party from any order of . . . termination of parental rights."). We have long recognized that a parent has a fundamental right recognized by the United States Constitution to parent his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Consequently, the signer is verifying documents related to his or her own fundamental rights as a parent to his or her child(ren).

The terms "verified" and "verification" are not defined in the Revised Kansas Code for Care of Children (the Code), K.S.A. 38-2201 et seq. While the Code does not define verified or verification, or specify what is required by a verification, another panel of this court has defined "verification." *In re K.D.*, No. 125,042, 2023 WL 2618972, at *5 (Kan. App. 2023) (unpublished opinion). Noting that "[t]he statute does not explain what is meant by the term 'verified' or specify the language that must be part of a verification," the panel defined verification:  "Verification means, '1. A formal declaration made in the presence of an authorized officer, such as a notary public, or (in some jurisdictions) under oath but not in the presence of such an officer, whereby one swears to the truth of the statements in the document.'" 2023 WL 2618972, at *5 (quoting Black's Law Dictionary 1873 [11th ed. 2019]).

Working from this definition of verification, we next consider the purpose of the verification requirement. In *In re J.A.*, 30 Kan. App. 2d 416, 422, 42 P.3d 215 (2002), a panel considered whether the statute's verification requirement applied to those who had not been personally served with process. In finding that the statutory verification did not apply, and thus the court had jurisdiction, the panel reviewed K.S.A. 38-1591, now K.S.A.

12

38-2273. At the time, K.S.A. 38-1591 recently had been amended to add subsection (e). L. 2000, ch. 150, § 22. The panel noted: "The minutes of the March 2[1], 2000, Senate Judiciary Committee meeting on Sub. S.B. 633 indicate that K.S.A. 38-1591(e) was designed to alleviate the problem of attorneys who were bound to proceed with appeals in termination cases even if the parent was disinterested or could not be located." 30 Kan. App. 2d at 422. The new provision "required the parent(s) to 'acknowledge their wish to continue appeal at every level of appeal or the appeal shall be dismissed.' Senate Judiciary Committee, March 2[1], 2000." 30 Kan. App. 2d at 422-23.

In *In re K.D.*, a similar case challenging the validity of a parent's verification under K.S.A. 38-2273(e), the panel also considered the statute's purpose. There, an interested party claimed our court lacked jurisdiction to hear the father's appeal due to father's verifications being fatally defective. The interested party argued that the verifications to the father's notice of appeal and docketing statement were signed after the court's oral pronouncement of terminating the father's rights—but before the journal entry of termination was filed. In addition to defining verification, the panel also considered K.S.A. 38-2273(e)'s purpose of relieving attorneys from the problem of being bound to proceed with an appeal even if the parent was uninterested or the attorney could not find the parent. The statute thus required that a party "'acknowledge their wish to continue appeal at every level of appeal or the appeal shall be dismissed.'" 2023 WL 2618972, at *6. The father argued that because K.S.A. 38-2273(e)'s verification requirement "merely acts as an acknowledgment that he sought to proceed with an appeal," and because he verified the documents after the court's oral pronouncement terminating his parental rights, the original verifications were valid. 2023 WL 2618972, at *6. The panel agreed, noting that when the father signed the verifications, he was aware of the court's order terminating his parental rights and he wished to appeal the court's decision. Under those set of factors, the panel found that the purpose of the verification requirement had been satisfied and, thus, his verifications were sufficient. 2023 WL 2618972, at *6.

13

Mindful of how our court has defined verification and the purpose of K.S.A. 38-2273(e)—to acknowledge a parent's wish to continue an appeal at every level of appeal—we consider Mother's verification. Here, Mother's verification acknowledged that she had read and understood the notice of appeal. The notice of appeal clearly states that Mother was appealing the district court's parental termination order: "Comes now counsel for [Mother] and hereby provides notice of appeal of the decision of the Court issued on the 27th day of April, 2023, specifically the order Terminating Parental Rights." In light of this, it cannot be said that Mother did not wish to continue the appeal at that stage. Her notarized signature on the notice of appeal satisfies the purpose of K.S.A. 38-2273(e)'s verification requirement. Mother's unchallenged verification for her amended brief also demonstrates her continued desire to appeal the court's order. We thus find Mother's original verification for her notice of appeal was sufficient as a matter of law for including a qualification—the word "believe"—in her verification for the appeal notice. With our finding that Mother's notice of appeal was sufficient, this appeal is properly before us for review. See *In re K.D.*, 2023 WL 2618972, at * 6.

We thus have jurisdiction.

II.     THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE DISTRICT COURT'S FINDING THAT MOTHER WAS AN UNFIT PARENT

A parent has a fundamental right recognized by the United States Constitution to parent his or her child. *Santosky*, 455 U.S. at 753. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021).

14

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). When reviewing these decisions, we "do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

*Discussion*

Mother asserts there was insufficient evidence to support the district court's finding that she was unfit. Before addressing Mother's argument, we must address one procedural matter. The GAL asserts that Mother failed to designate a record sufficient for us to review her appellate claims. Mother failed to include in the record on appeal any of the State's seven exhibits admitted at the termination hearing. Mother has the burden to designate a record that is sufficient for the reviewing court to consider her claims. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). "If . . . an argument depends on facts, those facts must be in the record." *In re A.A.-F.*, 310 Kan. 125, 141-42, 444 P.3d 938 (2019). It is arguable that we are unable to evaluate the sufficiency of the evidence without the exhibits admitted at the hearing. "It is well settled that absent an objection, the trial court is presumed to have found all facts necessary to support its judgment." *In re J.D.C.*, 35 Kan. App. 2d 908, 916, 136 P.3d 950 (2006). Mother did not object to the admission of the State's exhibits. "Without an adequate record, [an appellant's] claim of alleged error fails." 35 Kan. App. 2d at 916.

In *In re P.H.*, No. 121,869, 2020 WL 3481530, at *14 (Kan. App. 2020) (unpublished opinion), another panel of this court found that a parent's failure to provide a record of "all of the evidence admitted" and considered by the district court at the

termination hearing, including many of the evidentiary exhibits, eliminated meaningful review as required for a claim of insufficient evidence. The panel stated it "'cannot evaluate the sufficiency of the evidence supporting [the district court's] finding without considering the [evidence] on which it was based.'" 2020 WL 3481530, at *14.

We review the record for clear and convincing evidence supporting the district court's finding that Mother is unfit and that her condition is unlikely to change in the foreseeable future. See K.S.A. 38-2269(a)(1). While our review of sufficiency of the evidence is limited due to the exclusion of the exhibits, the record does include the transcript of the termination hearing and the district court's journal entry terminating Mother's parental rights, which permits our review.

*Evidence of Unfitness*

The district court may rely on the list of nonexclusive factors in K.S.A. 38-2269(b)-(e) to determine whether a parent is unfit. See *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021). A single factor may be enough to terminate parental rights. K.S.A. 38-2269(f); *In re E.L.*, 61 Kan. App. 2d at 323. The district court may also rely on one or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271. Termination requires evidence of unfitness in the present and the foreseeable future. K.S.A. 38-2269(a); *In re E.L.*, 61 Kan. App. 2d at 323; see *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010) ("[A] petitioner . . . bears the burden of proving by clear and convincing evidence that termination of parental rights is appropriate.").

In this case, the district court found Mother unfit based on several statutory factors, including:

1. K.S.A. 38-2269(b)(1)—emotional illness, mental illness, mental deficiency, or physical disability of a parent;

16

2. K.S.A. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child;

3. K.S.A. 38-2269(b)(7)—failure of reasonable efforts by agencies to rehabilitate the family;

4. K.S.A. 38-2269(b)(8)—lack of effort of a parent to adjust circumstances, conduct, or conditions to meet the needs of the child;

5. K.S.A. 38-2269(c)(2)—failure to maintain regular visitation;

6. K.S.A. 38-2269(c)(3)—failure to carry out a reasonable plan toward reintegration;

7. K.S.A. 38-2271(a)(6)—presumed unfitness because the child was out of home for two years or longer, the parent failed to carry out a reasonable plan toward reintegration, and a substantial probability the parent will not carry out a plan in the near future.

Mother asserts there was insufficient evidence to support the district court's finding that she was unfit. She did not address any of the statutory factors specifically.

"An appellant's failure to address all the alternative grounds for the district court's judgment renders the issues on appeal academic and unassailable. See *Greenwood v. Blackjack Cattle Co.*, 204 Kan. 625, 627-28, 464 P.2d 281 (1970) (when district court's decision is based on alternative grounds, appellant's failure to challenge all grounds on appeal 'renders unnecessary' a decision on the issue raised)." *In re K.C.D.*, No. 119,056, 2018 WL 6253333, at *4 (Kan. App. 2018) (unpublished opinion).

Likewise, issues not adequately briefed are deemed waived or abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). We could find that Mother has waived or abandoned this issue. Nevertheless, due to Mother's fundamental rights at issue in this case, we will review the district court's findings of Mother's unfitness.

Mother points to the following facts without further elaboration: "[Mother] completed Court orders, case plan tasks, a mental health assessment, counseling, therapy, participated in parenting time with both children, and communicated with social workers regularly. She maintained employment and adjusted her circumstances significantly— found more suitable housing and secured a divorce."

Mother fails to specify which court orders she complied with or how that corresponds to any of the statutory factors. She failed to include a copy of the case plan in the record on appeal, and she fails to specify which case plan tasks she completed. Mother fails to explain what counseling she has undertaken. While she asserts that she has completed therapy, it was clear from the testimony at the termination hearing that she was not open and receptive to therapy, had missed several appointments, and was discharged from at least one therapist for noncompliance. Mother fails to explain why she cut her parenting time short on so many occasions. She fails to explain why her visitation never progressed past supervised visits to unsupervised visits. And while her apartment was found minimally acceptable at one point, more recent news reports painted a disturbing picture of the apartment complex where Mother was living.

Mother states that she would participate in family therapy. She contends that TFI did not make reasonable efforts to rehabilitate the family because "simple communication among the therapists and the social workers could have allowed [family therapy] to happen." But Mother fails to address why she never signed the releases necessary for the case workers to communicate with her therapist. And she fails to address the fact that the children's individual therapist could not recommend family therapy due to Mother's behavior. Still, we will address this issue despite the brief's shortcomings.

*K.S.A. 38-2269(b)(1)—emotional illness, mental illness, mental deficiency, or physical disability of a parent*

A district court may find a parent unfit if there is clear and convincing evidence that the parent suffers from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render that parent unable to care for the ongoing physical, mental, and emotional needs of his or her child. K.S.A. 38-2269(b)(1).

Wright diagnosed Mother with adjustment disorder with mixed anxiety and depressed mood. In making this diagnosis, Wright recommended Mother undergo psychological evaluations based on Mother's self-reported traumatic brain injury. Mother's case plan task required her to maintain individual therapy, but Wright discharged her for noncompliance. The report on Mother's psychological evaluation "indicated that there could be cognitive impairments that required further testing" and "to continue therapy." But Mother did not undergo further testing and, when meeting with another therapist, she was not open and receptive to therapy.

When ruling on Mother's unfitness, the district court mentioned that Mother had informed Wright of a traumatic brain injury that occurred when she was younger and remarked that it may be for that reason that Mother still does not seem to understand the gravity of the abuse perpetrated by her husband on her child.

Upon review of the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Mother suffers from an emotional illness, mental illness, or mental deficiency of such duration or nature as to render her unable to care for the ongoing physical, mental, and emotional needs of K.S. and E.S.

19

*K.S.A. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of the child*

The court may terminate a person's parental rights if the court finds the parent unfit because of "physical, mental or emotional abuse or neglect or sexual abuse of a child." K.S.A. 38-2269(b)(4); see *In re D.G*, 319 Kan. 446, 453-54, 555 P.3d 719 (2024).

Runnion testified that K.S. said Mother "'had been emotionally and physically abusive to her for many years.'" Runnion's testimony revealed that Mother called K.S. "'fat, ugly, and a disgrace.'" K.S. informed Runnion of incidents where Mother pulled her hair, shoved her, and slapped her in the face. On January 5, 2022, K.S. told Runnion "'that she had mixed feelings'" regarding reintegrating with Mother and "'knows her mother will not keep her safe.'"

Viewing the evidence offered in the termination hearing in the light most favorable to the State, we find there is clear and convincing evidence to support the district court's finding of unfitness under this factor.

*K.S.A. 38-2269(b)(7)—failure of reasonable efforts by agencies to rehabilitate the family*

K.S.A. 38-2269(b)(7) states the court shall consider "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This record shows that the agencies' efforts were reasonable. Marcy recommended therapists, helped Mother file for divorce from Father, provided Mother information on legal resources, and supervised visitation. Despite the agency's continuous emphasis on the importance of mental health services, Mother did not maintain consistent mental health services, failing to show for appointments and being discharged for noncompliance. The evidence

20

supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family had failed.

*K.S.A. 38-2269(b)(8)—lack of effort of a parent to adjust circumstances, conduct, or conditions to meet the needs of the child*

K.S.A. 38-2269(b)(8) provides that "[i]n making a determination of unfitness the court shall consider . . . [the] lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Mother stated in conclusory fashion that she did complete case plan tasks. But Mother failed to include a copy of the case plan in the record on appeal, and she failed to specify which case plan tasks she completed. There was testimony at the termination hearing that Mother was told repeatedly not to involve boyfriends in visits with the children, but she continued to do so. There was testimony at the termination hearing that Mother was required by the case plan to attend individual therapy, but Mother was discharged from therapy for noncompliance. Mother also failed to provide the necessary releases for the social workers to communicate with her therapists.

Mother was unwilling or unable to complete all of the reintegration tasks. When viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's conclusion that Mother was unfit based on K.S.A. 38-2269(b)(8).

*K.S.A. 38-2269(c)(2)—failure to maintain regular visitation*

This statutory factor relates to a parent's "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child" while the "child is not in the physical custody" of the parent. K.S.A. 38-2269(c)(2); *In re D.M.*, No. 122,561, 2020 WL 5490880, at *6 (Kan. App. 2020) (unpublished opinion).

Mother asserts in conclusory fashion that she "participated in parenting time with both children." But she fails to rebut the State's evidence that she cut many of those visits short and that at least one holiday visit had to be moved from the home to a mall because Mother allowed her boyfriend to be present, which she knew was against the rules. Mother's visits never progressed in over two years from supervised to unsupervised. When viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's conclusion that Mother was unfit based on K.S.A. 38-2269(c)(2).

*K.S.A. 38-2269(c)(3)—failure to carry out a reasonable plan toward reintegration*

K.S.A. 38-2269(c)(3) provides that "when a child is not in the physical custody of a parent, the court, shall consider . . . [a parent's] failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Again, Mother failed to include the case plan in the record on appeal. It is the appellant's burden to include in the record on appeal any material on which the appellant bases a claim of error. "Without an adequate record, the claim of alleged error fails." *In re J.D.C.*, 35 Kan. App. 2d at 916.

*K.S.A. 38-2271(a)(6)—presumed unfit because child was out-of-home for two years or longer, parent failed to carry out a reasonable plan toward reintegration, and a substantial probability parent will not carry out plan in near future*

The district court found that Mother was presumed to be unfit under K.S.A. 38-2271(a)(6) because the children were in an out-of-home placement, under court order, for a cumulative period of two or more years; Mother failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the children into the parental

22

home; and there was a substantial probability that Mother would not carry out such plan in the near future. Mother does not argue error under this factor in her brief.

Mother does not assert that the district court arbitrarily disregarded undisputed evidence, nor does she argue that the district court's finding that she failed to rebut the presumption of unfitness was based on bias, passion, or prejudice. See *In re Marriage of Kuzanek*, 279 Kan. 156, 160, 105 P.3d 1253 (2005). Instead, she simply asks us to conclude that the evidence was insufficient to terminate her rights. But we cannot reweigh evidence. *In re Adoption of Baby Girl G.*, 311 Kan. at 806. Because Mother has failed to even assert that the district court's negative fact-finding was based on an arbitrary disregard of undisputed fact or an extrinsic consideration, she has waived and abandoned that argument. See 311 Kan. at 803.

Viewing all the facts and circumstances in the light most favorable to the State, we find that the State met its burden to prove Mother unfit "by reason of conduct or condition" making her "unable to care properly for a child." See K.S.A. 38-2269(a).

*Conduct or condition of unfitness unlikely to change in foreseeable future*

"After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a)." *In re D.G.*, 319 Kan. at 459. We may look to a parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). When assessing the foreseeable future, we must use "'child time'" as the measure. See *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014). The Code recognizes that children experience time differently than adults, and that different perception typically requires a prompt, permanent disposition. K.S.A. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

23

Mother asserts that the district court's determination that Mother's circumstances were unlikely to change in the foreseeable future was "fatally flawed." Mother argues that the district court could not undertake a "clear weighing" of whether she could adjust in the foreseeable future because it did not have her testimony. But the record is clear that Mother voluntarily left the termination proceeding early, preventing her counsel from calling her to testify. Thus, even if an error were made, the invited error doctrine bars Mother's argument. "An invited error is '[a]n error that a party cannot complain of on appeal because the party, through its conduct, encouraged or prompted the trial court to make the erroneous ruling.'" *Harder v. Foster*, 58 Kan. App. 2d 201, 212, 464 P.3d 382 (2020).

Concerning the foreseeable future, Marcy testified that she still had concerns, even after two-and-a-half years into the case, about Mother's ability to care for and protect her children. When specifically asked if Mother could make improvement in the foreseeable future, Kelly testified that in her opinion Mother already had a lot of time to make progress in the case and they "have not seen enough change to [reintegrate]."

Considering the evidence in the light most favorable to the State, we find a rational fact-finder could have found it highly probable that Mother's conduct or condition of unfitness was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS IN THE BEST INTERESTS OF THE CHILDREN

After the district court makes a finding that a parent is unfit, the district court then must determine by a preponderance of the evidence whether the termination of parental rights is in the child's best interests. See K.S.A. 38-2269(g)(1) (best interests); *In re R.S.*,

24

50 Kan. App. 2d at 1116 (preponderance of evidence). "K.S.A. 38-2269(g)(1) expressly identifies the physical, mental, and emotional health of the child as the primary factors a district court should consider in making its best-interests determination." *In re D.G.*, 319 Kan. at 461-62. "This assessment balances the negative effects of termination on the child with the benefits of 'permanency' in a different home environment." *In re D.M.*, 2020 WL 5490880, at *4.

*Standard of Review*

We review the district court's best-interests determination for abuse of discretion. "A district court abuses its discretion if no reasonable person would agree with the district court, or the court premised its decision on a factual or legal error." *In re E.L.*, 61 Kan. App. 2d at 330.

*Discussion*

When determining whether a district court's decision was premised on a factual error, another panel of this court specifically held that the preponderance-of-the-evidence standard of proof applies to best-interest findings in the district court. *In re R.S.*, 50 Kan. App. 2d at 1116. But our Supreme Court "has yet to decide whether the lower preponderance-of-the-evidence or the higher clear-and-convincing standard of proof applies to factual findings made under subsection (g)(1) . . . ." *In re D.G.*, 319 Kan. at 463. Regardless, Mother does not assert the district court made a factual error.

The district court's findings on best interests consisted of the following:

> "So I do find—in going to the issue of the best interest to terminate—this is a case—and when I'd heard the evidence in regards to the traumatic brain injury, I wondered if this was a situation that perhaps it would be good where the—the mother

25

could still have contact, and I'm not of that mind, necessarily, at this point in time. But that's not an issue for me to decide here today. I do find it's not in their—it is in their best interest to terminate the parental rights. Because I—the mother . . . did not meet the—cross the line she needs to cross.

. . . .

"There has been a lot of discussion about—and testimony—concerning permanency in this case. There's a lot of case law on that. It's something that we talk about, you know, seems like all the time—as well we should in these cases. And it is a little different standard when the children are a certain age—and different ages—but I think [K.S.] and [E.S.] have waited long enough. And they—they need to have somebody they can count on. And so I do find that it's in the best interest to terminate parental rights."

Mother asserts: "There is no evidence to support the finding that the termination of the parent-child relationship between [Mother] and the minor children is in their best interest. The [d]istrict [c]ourt improperly disregarded the strong presumption that the children should remain with [Mother]."

There was ample evidence presented to the district court that Mother was incapable of keeping the children safe. K.S. did not trust Mother to keep her safe. Marcy testified that termination was in the children's best interests. It was not an abuse of discretion for the district court to find termination of Mother's parental rights was in the best interests of the children.

Affirmed.

26